IN THE UNITED STATES DISTRICT COURT
DISTRICT OF SOUTH CAROLINA
CHARLESTON DIVISION

| | | |
|---|---|---|
| Madison at Hamlin Plantation Townhome Association, Inc. and Timothy J. Rollins, individually, and on behalf of other similarly situated, | ) ) ) ) | C/A NO.: 2:15-cv-04120-DCN |
| | ) | |
| Plaintiffs, | ) ) | |
| v. | ) ) | **AMENDED COMPLAINT** |
| JW Homes, LLC; Residential Partners, LLC; Wheelock Street Capital, LLC; John Wieland, individually; Sue Wieland; Jack Wieland; Lindsey Parker; Robert Parker; JWC Phoenix, LLC; WS JWH, LLC; JW Land Investment, LLC; Middlesex Partners, LLC; Wheelock Street Investment Management, LLC; Wheelock Real Estate Land Fund, LP; and JWC Guilford, LLC, | ) ) ) ) ) ) ) ) ) ) ) | **(Jury Trial Demanded)** |
| Defendants. | ) ) | |

The Plaintiffs, Madison at Hamlin Plantation Townhome Association, Inc. and Timothy J. Rollins, individually and on behalf of all others similarly situated, would respectfully allege and show the Court as follows:

## SUMMARY OF CASE

1.      Plaintiffs brought suit in Charleston County South Carolina, Court of Common Pleas, against the Old Wieland Entities (Case Number 2013-CP-10-5559) alleging defective construction of their townhomes, and thereafter documented damages in excess of $22,000,000.00 against the Old Wieland Entities and others.  Unfortunately for the homeowners, approximately one year prior to the filing of their suit, in the fall of 2012, in fraud on then-current and future creditors, Plaintiffs included, the Old Wieland Entities and their affiliates and owners had transferred all their assets to new companies formed by a northeast real estate investment firm,

with non-public equity and profit provisions for the Wieland Family (hereinafter "The First Transaction"). The new companies owning the Wieland Assets then proceeded to make millions of dollars in annual profits until reselling the Wieland assets approximately three years later for nearly three times what had been paid, a return of nearly 100% per year (hereinafter "The Second Transaction"). This suit seeks to secure the funds and profits which should be available to pay Plaintiffs' claims in the underlying defective construction litigation.

## PARTIES AND JURISDICTIONAL STATEMENT

2. Plaintiff Madison at Hamlin Plantation Townhome Association, Inc. (the "Association") is a non-profit corporation organized and existing under the laws of the State of South Carolina.

3. The Association is the property owners association for Madison at Hamlin Plantation Townhomes.

4. Madison at Hamlin Plantation Townhomes consists of one hundred fourteen (114) townhomes in twenty-five (25) buildings located within the Hamlin Plantation subdivision, which is located in Mount Pleasant, South Carolina. The townhomes and common and limited common elements are hereinafter referred to collectively as "The Madison."

5. By virtue of the governing documents, the Association is charged with certain duties, powers, rights and authority in connection with The Madison. The Association is charged with, inter alia, the management and administration of The Madison, the investigation, maintenance and repair of The Madison's Common and Exterior Elements and Areas of Responsibility, and has the right and obligation to bring this action on behalf of The Madison, the Association, and the respective owners and members.

6.      Plaintiff Timothy J. Rollins (hereinafter "Plaintiff Rollins") is a citizen of Charleston County, South Carolina, and is an owner of a townhome located in Madison at Hamlin Plantation, more particularly described as 3485 Billings Street, Mount Pleasant, South Carolina, 29466. Plaintiff Rollins is a member of the Association, has been a member of the Association at all times relevant hereto, and has ownership and membership rights relating thereto.

7.      Builders Support Services of the Carolinas, Inc., individually, and f/k/a John Wieland Homes and Neighborhoods Of The Carolinas, Inc., individually, and as result of merger as John Wieland Homes and Neighborhoods Of The Carolinas, Inc., and John Wieland Homes and Neighborhoods Of South Carolina, Inc. is a foreign corporation organized and existing under the laws of the State of Georgia and are collectively referred to hereafter as "Old Wieland Entities."

8.      The Old Wieland Entities developed, constructed, and placed The Madison townhouses into the stream of commerce.

9.      Defendant John Wieland (hereinafter "Wieland") is an individual with his primary place of domicile in the state of Georgia.

10.      Wieland was the founder, owner, controller, and public face of the above named Old Wieland Entities.

11.      Defendant Sue Wieland is the wife of Defendant John Wieland. Upon information and belief, Sue Wieland's place of domicile is in the state of Georgia.

12.      Defendants Lindsey Parker and Jack Wieland are the daughter and son of John and Sue Wieland, and Defendant Robert Parker is the son-in-law of John and Sue Wieland (all five collectively hereinafter referred to as the "Wieland Family"). Upon information and belief, Jack Wieland's place of domicile is in the state of Georgia; Robert and Lindsey Parker's place of domicile is in the state of Massachusetts.

3

13.    The Old Wieland Entities and Wieland Family held, owned, controlled, and/or held additional real estate inventory in additional single purpose entities (SPE) (hereinafter referred to as "Wieland SPE affiliates").

14.    The Wieland SPE affiliates were publicly owned and controlled in the names of Sue Wieland and/or Robert Parker.

15.    The use of Wieland SPE affiliates was for the purpose of hindering the creditors of the Old Wieland Entities.

16.    Wieland and Robert Parker spearheaded the Wieland Family's negotiation and consummation of the First Transaction.

17.    Defendant Wheelock Street Capital, LLC (hereinafter "Wheelock Capital") is a foreign corporation organized and existing under the laws of the State of Delaware, which describes its business as that of real estate investments.

18.    Defendant WS JWH, LLC (hereinafter referred to as "Wheelock SPE") is a single-purpose entity formed or caused to be formed by Wheelock Capital in the fall of 2012.

19.    The Wheelock SPE originally owned Residential Partners outright until November 15, 2012; and continued owning a majority interest in Residential Partners after the First Transaction.

20.    Defendant Wheelock Street Investment Management, LLC (hereinafter "Wheelock Management) is a foreign entity that participated in the activity and transactions described herein.

21.    Defendant Wheelock Real Estate Land Fund, LP (hereinafter "Wheelock Fund") is a foreign entity that participated in the activity and transactions described herein.

22.    The foregoing Wheelock entities are hereinafter collectively referred to as "Wheelock."

23. Defendant Residential Partners, LLC (hereinafter "Residential Partners") is a foreign corporation organized and existing under the laws of a state other than South Carolina.

24. Residential Partners was formed, or caused to be formed, by Wheelock in the fall of 2012.

25. Defendant JW Homes, LLC (hereinafter "JW Homes") is a foreign corporation organized in the fall of 2012 and existing under the laws of the State of Delaware.

26. JW Homes was formed, or caused to be formed, by Wheelock and/or Residential Partners, LLC.

27. JW Homes is a wholly-owned subsidiary of Residential Partners, LLC.

28. Defendant JW Land Investment, LLC (hereinafter "JW Land") is a foreign corporation organized in the fall of 2012.

29. JW Land was formed, or caused to be formed, by Wheelock and/or Residential Partners, LLC.

30. JW Land is a wholly-owned subsidiary of Residential Partners, LLC.

31. Wheelock Capital owns and/or controls Wheelock SPE, which substantially owns and controls Residential Partners, LLC, which owns and controls both JW Homes and JW Land.

32. JWC Phoenix, LLC (hereinafter "JWC Phoenix") is a foreign corporation organized and existing under the laws of the State of Delaware that was created in the fall of 2012.

33. Middlesex Partners, LLC (hereinafter "Middlesex") is a limited liability company organized and existing under the laws of the state of Georgia that was formed by or for Robert and Lindsey Parker in the fall of 2012.

34. Robert and Lindsey Parker are the sole members and owners of Middlesex.

35. Middlesex is the majority owner of JWC Phoenix, LLC.

36.     The balance of JWC Phoenix, LLC is owned by Jack Wieland.

37.     JWC Phoenix, LLC owns a minority interest in Residential Partners.

38.     Defendant JWC Guilford, LLC (hereinafter "JWC Guilford) is a corporation organized in 2012 and existing under the laws of the State of Georgia.

39.     JWC Guilford is owned and/or controlled by Wieland and is allegedly part owner of Residential Partners and/or one of the other entities referred herein.

40.     Wheelock and the Wieland Family own, manage, and control Residential Partners, JW Homes, and JW Land through the above-described entities.

41.     Residential Partners has profit distribution terms that are not congruent with its members' ownership percentages.

42.     Wheelock and the Wieland Family are de facto joint venture partners in the operation of John Wieland Homes and Neighborhoods (hereinafter "Wieland Homebuilding Enterprise") through Residential Partners and its subsidiaries, JW Homes and JW Land.  In fact, one or more of the Parties' Agreements refer to Residential Partners by the acronym "JV," a reference to "Joint Venture."

43.     This Honorable Court has jurisdiction over all subject matter alleged herein and over all parties hereto and venue is proper in this forum.

## ADDITIONAL ALLEGATIONS

44.     In or about mid-2012, Defendants began negotiating a transfer of substantially all assets owned and/or controlled by Old Wieland Entities and Wieland Family Members to new entities that would ultimately be jointly owned by Wheelock and Wieland Family members.

45.     To increase the net asset value of the assets being transferred, Defendants negotiated an approximate $100,000,000.00 loan discount from the Old Wieland Entities' principal lender, under the threat of bankruptcy and under the guise of a distress sale.

46.     The distress sale was originally allegedly being made by Sellers to a new company in which Wieland would indirectly hold a small ownership interest; however, in a side deal contemplated during the entire series of transactions and signed on the date of the closing, parties arranged for the Wieland Family Members to have substantial equity and profit interests in the newly-created operating company.

47.     Subsequently, three years later, Defendants resold the Wieland Homebuilding Enterprise for nearly three times what had been paid for them.

### (First Transaction, Part I)

48.     Specifically, in or around August 2012, Defendants negotiated and executed an Asset Sale Support Agreement with Bank of America (hereinafter "The Haircut").

49.     The Haircut provided for Bank of America (hereinafter "BOA") to accept approximately $127,000,000 payoff on an outstanding debt of approximately $225,000,000.

50.     The Haircut was negotiated based in part on the terms of a proposed collateral sale and in part upon a bankruptcy filing and sale if the then-proposed collateral sale fell through.

51.     The terms of the proposed collateral sale, presumably including the terms of any future Wieland Family equity or profits in the assets, was set forth on an Exhibit A "Term Sheet."

52.     Despite repeated requests, Defendants have refused to produce a copy of the Term Sheet to Plaintiffs (and removed or omitted it from the copy of the Asset Sale Support Agreement provided to Plaintiffs).

53.     In light of the hiding of the term sheet, the late execution of the Side Agreement, and the late execution and amendment of the Residential Partners Operating Agreement (which contains the preferential profit or "promote" distributions to the Wieland Family), and in light of the inconsistency regarding Wieland equity in the Deficiency Documents as compared to the Promote Distributions and other advantageous Wieland Family terms in the Amended and Restated Residential Partners, LLC Operating Agreement, it can only be concluded that the terms in the Term Sheet, represented by Defendants to BOA for the Haircut, are different for the Wieland Family than that which was ultimately included in the First Transaction.

**(First Transaction, Part II)**

54.     Subsequent to the execution of the Support Agreement, Defendants executed on October 12, 2012, a "Purchase and Sale Agreement" providing for the sale of substantially all of the Old Wieland Entities assets to Residential Partners (hereinafter referred to as the Principal Agreement").

55.     The Principal Agreement was expressly contingent upon Defendants reaching Agreement on an Investment Asset Purchase agreement (above and below referred to as "the Side Agreement").

56.     The Side Agreement was nominally to provide for the sale of real estate assets held by single-purpose entities ("SPE") owned by Sue Wieland to Residential Partners.

57.     As it turns out, the Side Agreement, accompanied by the Amended and Restated Residential Partners Operating Agreement, both signed at closing, was the vehicle by which Defendants attempted to effectuate the Wieland Family's new ownership interests in Residential Partners, which would own the SPE, JW Homes, which would continue conducting the "John Wieland Homebuilding Enterprise," as hereinafter further defined.

**(First Transaction, Part III)**

58.     Residential Partners assigned the rights to the assets it was getting through the Principal Agreement and the Side Agreement to JW Homes and JW Land.

59.     There is no known evidence that JW Homes or JW Land paid or granted any consideration for the assignment.

60.     On or about, November 15, 2012, the Parties closed on the Principal Sales Agreement, the Side Agreement, and the Haircut.

61.     On or about November 15, 2012, the Old Wieland Entities and the Wieland Family transferred the John Wieland Homebuilding Enterprise to JW Homes and JW Land.  This included the assets, business, intellectual property, goodwill, management, employees, intellectual property rights, contracts, real estate inventory, and substantially all of the ongoing business assets of the Old Wieland Entities and affiliates.

62.     In both the October and November 2012 Agreements, the Parties negotiated and consummated complicated risk sharing agreements as to both the past and future claims/liabilities through the use of multiple indemnification agreements with minimum thresholds and maximum caps to further the joint venture.

63.     As part of the First Transaction, the Wieland Family retained their equity and profit interests and substantial control by swapping indirect interests in the pre-November 15, **2012** John Wieland Homebuilding Enterprise for indirect interests (and disproportionately large profits interests) in the post-November 15, **2012** John Wieland Homebuilding Enterprise.

**(The Second Transaction)**

64.     During 2013 to 2015, the John Wieland Homebuilding Enterprise continued unabated, selling an ever increasing approximately 500 residences per year at an average sales

price of approximately $450,000.00 per residence, resulting in average annual sales of approximately $22.5 million per year or better. Upon information and belief, this yielded profits before taxes and interest of approximately $4.0 million per year or more.

65.     On or about December 15, 2015, JW Homes and JW Land contracted to sell the John Wieland Homebuilding Enterprise to PulteGroup, Inc. (hereinafter "Pulte").

66.     Subject to adjustments, the sales price for the John Wieland Homebuilding Enterprise assets was approximately $435.0 million.

67.     In or about mid-January 2016, the sale of the John Wieland Homebuilding Enterprise to Pulte was consummated ("The Second Transaction").

68.     The John Wieland Homebuilding Enterprise, less any homes sold in the interim, were sold for nearly three times the consideration paid for the Enterprise three years earlier.

69.     The resale of the John Wieland Homebuilding Enterprise yielded a rate of return of nearly 100% per year for the Wheelock Defendants and the Wieland Family.

70.     The sale of the John Wieland Homebuilding Enterprise to Pulte resulted in immense profits to the Wieland Family from interests that it had wrongfully removed and converted from the Old Wieland Entities and their affiliates.

**(The Operation of the John Wieland Homebuilding Enterprise during the Intervening Three Years between the First and Second Transactions)**

71.     As stated earlier, the John Wieland Homebuilding Enterprise continued to yield substantial cash flows and profits on and after November 15, **2012**.

72.     The operation of the Wieland Homebuilding Enterprise remained virtually unchanged.

73.     The new entities, which remained under substantial control by Wieland, advertised and promoted their forty years of homebuilding experience, even though all the new entities were created in the fall of 2012.

74.     JW Homes was in fact a continuation of, and a successor to, the entities that operated the John Wieland Homebuilding Enterprise prior to November 15, 2012:

a.     JW Homes operated the John Wieland Homebuilding Enterprise under the "John Wieland" tradename;

b.     JW Homes continued the John Wieland Homebuilding Enterprise with substantially the same employees;

c.     JW Homes continued the John Wieland Homebuilding Enterprise with substantially the same management personnel;

d.     JW Homes continued Wieland Homebuilding Enterprise with one or more of the same Board members and/or executive personnel;

e.     JW Homes occupied the same corporate office as the Old Wieland Entities did prior to the First Transaction;

f.     JW Homes maintained the same telephone numbers as the Old Wieland did prior to the First Transaction;

g.     JW Homes maintained the same internet and email domain ("jwhomes.com") as the Old Wieland did prior to the First Transaction;

h.     JW Homes continues to market itself utilizing the reputation, awards, experience, and history of Wieland and the Old Wieland Entities;

i.     JW Homes continued to use Wieland's mantra "enduring core values, known as ep$^2$ic: Excellence, Passion, Presentation, Integrity, Completeness." See "Exhibit A."

j.     JW Homes continued the Wieland Homebuilding Enterprise in the same locations in which Wieland previously operated;

k.     JW Homes possessed the corporate records of Wieland; and

l.    Residential Partners and JW Homes, expressly assumed most of the warranty obligations of the Old Wieland Entities.

75.    Although JW Homes was not created until October 30, 2012, it claims to have forty-five (45) years of experience as of September 2, 2015.  See "Exhibit A" attached hereto.

a.    JW Homes could only have forty-five (45) years of experience if, in fact, it is a continuation of Wieland.

b.    On its website, <u>JW Homes claims to have been founded in 1970</u>. See "Exhibit A."

76.    The Wieland Family continued to avail itself of the benefits of the Wieland Homebuilding Enterprise while concealing their continued participation from the public, Plaintiffs included.

77.    The Old Wieland Entities were subsumed by JW Homes, JW Land, and Residential Partners at the time of the First Transaction.

78.    The Old Wieland Entities have defended over one hundred (100) lawsuits claiming defective construction in Charleston County and many more elsewhere.

79.    Defendants knew of the Old Wieland Entities' long history of defective construction.  If it was not apparent to Wheelock prior to the commencement of negotiations, Wheelock was certainly put on notice of it by the litigation disclosure schedule provided to Wheelock prior to November 15, **2012**.

**(Effect on Madison Owners)**

80.    Defendants knowingly and willfully stripped the Old Wieland Entities of assets and left Wieland with no assets available to compensate their prior clients for defectively constructed homes and/or to rectify the defects.

81.     As a direct and proximate result of Defendants' forgoing activities, Plaintiffs have been proximately damaged in an amount to be determined by the trier of fact and have had to incur reasonable attorneys' fees and costs.

82.     Plaintiffs have been deprived of recourse and repair monies for their defective homes.

83.     Plaintiffs have further had to endure substandard and potentially dangerous living conditions, delays in repairs, and loss of the value of their equity in their homes.

84.     For most class members, these townhomes constitute their most significant asset, currently and in retirement, and the impairment of this asset and lack of repair funds causes the Plaintiff class financial stress.

85.     Plaintiffs are incurring increased expenses for temporary repairs while the permanent resolution is delayed by Defendants' activities.

86.     Plaintiff Association's reserves are being depleted by the foregoing, and Plaintiff class members are facing higher regime fees and/or future assessments as a result.

## CLASS ACTION ALLEGATIONS

87.     Pursuant to the common law of South Carolina and Rule 23 of the South Carolina Rules of Civil Procedure ("SCRCP"), Plaintiff Rollins brings this action both individually and as a proposed class action against Defendants on behalf of himself and all other similarly situated persons and entities who own a townhome within The Madison (hereinafter collectively referred to as the "Class").  The Class is more particularly defined as follows:

> All persons and entities that are members of The Madison at Hamlin Plantation Townhome Association.
>
> Excluded from the Class are: (a) any Judge presiding over this action and members of their families; (b) Defendants and any entity in which Defendants have a controlling interest or which have a controlling interest

in Defendants and their legal representatives, assigns and successors of Defendants and Defendants' current or former employees, investors, members, or officers; and (c) all persons who properly execute and file a timely request for exclusion from the Class.

88.     The State Court has already certified this class in the Underlying Construction litigation, albeit with a different class representative. Therefore, the only question that should need addressing in this case is the suitability of Rollins; however, Plaintiff Rollins will address the remaining criteria regardless.

89.     *Numerosity*: The Class is composed of in excess of one hundred twenty persons geographically dispersed in and out of the State of South Carolina, the joinder of whom in one action is impractical. When spouses and co-owners are considered, the Class is expected to be nearly two hundred members.

90.     *Commonality*: Questions of law and fact common to the Class exist as to all members of the Class and predominate over any questions affecting only individual members of the Class. These common legal and factual issues include the following:

a.     Whether the defendants acted and or conspired to defeat the rights of current and future creditors;

b.     Whether the defendants should be amalgamated, treated as successors, treated as a continuation, or have their veils pierced;

c.     Whether Defendants have acted or refused to act on grounds generally applicable to the Class;

d.     Whether Defendants are financially responsible to pay any judgment obtained against Old Wieland Entities;

e.     Whether Plaintiffs and the Class are entitled to additional compensation for the afore described special damages; and,

f.     Whether the Plaintiffs are entitled to prejudgment interest, statutory damages, punitive damages, attorneys' fees and costs from Defendants.

14

91. *Typicality*: Plaintiffs' claims are typical of the claims of the members of the Class, as all such claims arise out of Defendants' wrongful conduct in constructing The Madison.

92. *Adequate Representation*: Plaintiff Rollins will fairly and adequately protect the interests of the members of the Class and has no interests antagonistic to those of the Class. Plaintiff Rollins has retained counsel experienced in the prosecution of construction defect claims and complex litigation, including consumer class actions involving product liability and product design defects.

93. *Predominance and Superiority*: This class action is appropriate for certification because questions of law and fact common to the members of the Class predominate over questions affecting only individual members, and a Class action is superior to other available methods for the fair and efficient adjudication of this controversy since individual joinder of all members of the Class is impracticable. Should individual Class Members be required to bring separate actions, this Court would be confronted with a multiplicity of lawsuits burdening the court system while also creating the risk of inconsistent rulings and contradictory judgments. In contrast to proceeding on a case-by-case basis, in which inconsistent results will magnify the delay and expense to all parties and the court system, this class action presents far fewer management difficulties while providing unitary adjudication, economies of scale and comprehensive supervision by a single Court.

94. Defendants have acted on grounds generally applicable to the Class. Class certification is appropriate under South Carolina law because Defendants engaged in a uniform and common practice. All Class Members have the same legal right to and interest in redress for damages associated with the defective conditions existing within The Madison.

95.     Plaintiff Rollins and the Class envision no unusual difficulty in the management of this action as a class action.

96.     Each Class Member has an interest of more than $100.00.

97.     The amount of money at stake for each Class Member is not sufficient for each member to hire their own counsel and engineers and bring their own action.

### ESTOPPEL FROM PLEADING AND TOLLING OF APPLICABLE STATUTES OF LIMITATIONS

98.     Defendants are estopped from relying on any statutes of limitation or repose by virtue of its acts.  Upon information and belief, Defendants knew, or should have known, Wieland owed Plaintiffs certain warranty and other legal obligations at the time Defendants purchased Wieland's assets and business.

99.     Defendants had a duty to inform Plaintiffs that Defendants were liquidating Wieland's assets available to fulfill Wieland's warranty and other legal obligations. Notwithstanding its duty, Defendants never disclosed this to Plaintiffs.

100.     Despite exercising reasonable diligence, Plaintiffs could not have discovered the liquidation of Wieland's assets.

101.     Given Defendants' failure to disclose this non-public information and because Plaintiffs could not reasonably have known of Wieland's inability to fulfill its warranty and other obligations, Defendants are estopped from relying on any statutes of limitations or repose that might otherwise be applicable to the claims asserted herein.

### FOR A FIRST CAUSE OF ACTION
**(Civil Conspiracy as to All Defendants)**

102.     Plaintiffs repeat and re-allege the allegations contained in the above paragraphs as if fully set forth herein.

103.    Defendants have conspired and acted in concert and in combination in the above acts with the intent to injure Plaintiffs for Defendants' gain and benefit.

104.    Defendants' above-described acts have caused Plaintiffs the above-described special damages.

105.    Plaintiffs are entitled to an award of damages in an amount to be determined by the trier of fact.

106.    If it is shown that Defendants' actions were committed maliciously, wantonly, and/or with reckless disregard for the rights of others, Plaintiffs are entitled to an award of punitive damages against Defendants.

## FOR A SECOND CAUSE OF ACTION
**(Violation of the Unfair Trade Practices Act by Association as to Wheelock Defendants)**

107.    Plaintiffs repeat and re-allege the allegations contained in the above paragraphs as if fully set forth herein.

108.    Wheelock Defendants are in the business of purchasing and/or investing in businesses by buying assets, shedding liabilities, and operating though corporate shells, as has been done here.

109.    Wheelock Defendants are engaged in commerce as defined by the South Carolina Unfair Trade Practices Act.

110.    Wheelock Defendants' above- and below-described activities, including raiding, depleting, and wasting the corporate assets of Wieland such that Wieland is unable to honor its warranty and other legal obligations to Plaintiffs, constitute unfair and deceptive practices in the conduct of their trade.

111.    Defendants' above-described acts are capable of repetition and adversely affect the public interest.

112.     Defendants knew, or should have known, their conduct was in violation of South Carolina Code Section 39-5-20.

113.     Defendants' wrongs entitle Plaintiffs to an award of treble damages, attorneys' fees, and costs.

## FOR A THIRD CAUSE OF ACTION
### (Successor Liability as to All Defendants except Old Wieland Entities)

114.     Plaintiffs repeat and re-allege the allegations contained in the above paragraphs as if fully set forth herein.

115.     Defendants are liable to Plaintiffs on Old Wieland Entities' obligations as:

    a.     The First Transaction was an implied or de facto merger of the Old Wieland Entities, the Wieland Family affiliates, Wheelock, and the entities created in the fall of 2012;

    b.     JW Homes, JW Land, and Residential Partners (hereinafter "The Trio") are a mere continuation of the Old Wieland Entities;

    c.     The transfer of assets constituted a fraudulent transfer for inadequate consideration;

    d.     There exists a continuity of enterprise between Old Wieland Entities and the Trio;

    e.     The Trio continued the Wieland product line and the John Wieland Homebuilding Enterprise; and

    f.     The First Transaction was inequitable and left Plaintiffs without an adequate remedy.

116.     Therefore, The Trio is responsible and liable for the obligations of Old Wieland Entities, including the cost of repair, loss of use, and any judgment thereon; further, the remaining Defendants (excepting the Old Wieland Entities) are liable thereon if they have now looted The Trio of all the cash flows and profits from the operation and sale of the John Wieland Homebuilding Enterprise.

## FOR A FOURTH CAUSE OF ACTION
### (Amalgamation Liability as to All Corporate and LLC Defendants)

117.    Plaintiffs repeat and re-allege the allegations contained in the above paragraphs as if fully set forth herein.

118.    These Defendants have operated the John Wieland Homebuilding Enterprise in such a manner that the distinctions between the entities and their activities have become blurred.

119.    There is excessive interrelationship between the entities and their activities, a sharing of management and employees and other public assets, and an absence of delineation between the entities such that the public is unable to tell where one entity's activities stop and the next entity's activities start.

120.    Treating these Defendants as separate entities will perpetuate an injustice on Plaintiffs and allow Defendants to unjustly enrich themselves by untoward means.

121.    These Defendants should be amalgamated for purposes of any judgment in this action.

## FOR A FIFTH CAUSE OF ACTION
### (Veil Piercing Liability as to All Defendants)

122.    Plaintiffs repeat and re-allege the allegations contained in the above paragraphs as if fully set forth herein.

123.    The corporate and LLC Defendants are undercapitalized to meet the continuing obligations stemming from the original construction and sale of the Madison townhouses and the obligations, intended and otherwise, arising from the First Transaction.

124.    The Trio and the Wheelock Defendants did not pay adequate consideration to the Wieland Entities for the assets, business, intellectual property, and goodwill they received as a result of the Transaction.

125.    JW Homes and JW Land did not pay adequate consideration to Residential Partners for the assets, business, intellectual property, and goodwill they received as a result of the Transaction.

126.    The corporate and LLC Defendants were aware of the likelihood of Plaintiffs,' and others' claims of defective construction against the John Wieland Homebuilding Enterprise and any participants therein.

127.    It is fundamentally unfair to allow the Wheelock Defendants, the Wieland Family, and any intermediate corporation or LLC to hide from Plaintiffs' claims behind the subsidiaries' corporate shields.

128.    All corporate veils should be pierced and the Wheelock Defendants and the Wieland Family held liable for any judgment granted in this or the underlying action.

### FOR A SIXTH CAUSE OF ACTION
**(Fraudulent Conveyance as to All Defendants)**

129.    Plaintiffs repeat and re-allege the allegations contained in the above paragraphs as if fully set forth herein.

130.    While on notice of Plaintiffs' potential claims, Defendants engaged in a pattern and practice of transferring assets in an effort to defraud his creditors.

131.    The Wieland Family sold all of the Old Wieland Entities' assets, thus depriving the Old Wieland Entities of available resources to satisfy its debtors' claims, including Plaintiffs'.

132.    The transfers of the Old Wieland Entities' assets were made for inadequate consideration to the Old Wieland Entities.

133.    Defendants knew, or should have known, that creditors, including Plaintiffs, had potential claims against the Old Wieland Entities at the time of the transfers.

134.    The transfers were made with an actual or constructive intent to defraud creditors.

135.    The transfers of the Old Wieland Entities' assets are void because they were intended to delay, hinder, or defraud Plaintiffs of a just and lawful debt.

136.    Plaintiffs are entitled to have the John Wieland Homebuilding Enterprise, or the proceeds thereof, made subject to Plaintiffs' claims, or be awarded judgment thereon.

## FOR A SEVENTH CAUSE OF ACTION
### (Excessive/Illegal LLC Distributions as to All Defendants except Old Wieland Entities)

137.    Plaintiffs repeat and re-allege the allegations contained in the above paragraphs as if fully set forth herein.

138.    If the LLCs have failed to retain sufficient reserves to satisfy their warranty and creditor obligations, including this claim, then the LLC distributions to members are in excess of that which is reasonable and/or permitted by Statute.

139.    The return and repayment of the LLC distributions is required by law and equity to satisfy the claims of creditors.

140.    Plaintiffs are entitled to an order requiring the individual Defendants and the parent LLCs to return and pay back all unlawful and excessive LLC distributions to The Trio to pay Plaintiffs' claims hereunder.

WHEREFORE, Plaintiffs demand a trial by jury and pray actual, consequential, and special damages; statutory or punitive damages; reasonable attorneys' fees; costs of suit; prejudgment interest; judgment on all equitable causes of action; and granting such further relief as the Court deems just and proper.

Respectfully submitted this 11th day of January, 2017.


[SIGNATURE BLOCK ON NEXT PAGE]


21

JUSTIN O'TOOLE LUCEY, P.A.

/s/ Justin O'Toole Lucey
Justin O'Toole Lucey, Esq. (Fed. ID 5613)
Joshua F. Evans, Esq. (Fed. ID 10481)
415 Mill Street
Mt. Pleasant, SC 29464
(843) 849-8400
jlucey@lucey-law.com
jevans@lucey-law.com

**Attorneys for Plaintiffs**

**CERTIFICATE OF SERVICE**

I hereby certify that on January 11, 2017, I caused the foregoing document to be electronically filed with the Clerk of Court using CM/ECF, which will provide electronic notice of such filing to all counsel of record.


<u>/s/ Justin O'Toole Lucey</u>
Justin O'Toole Lucey